UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY CASANOVA,

    Petitioner,                    Civil No. 2:20-CV-10413
                                   HONORABLE DENISE PAGE HOOD
v.                                 UNITED STATES DISTRICT JUDGE

SHERMAN CAMPBELL,

    Respondent,
_____/

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF
HABEAS CORPUS, DECLINING TO ISSUE A CERTIFICATE OF
APPEALABILITY, AND GRANTING PETITIONER LEAVE TO APPEAL
*IN FORMA PAUPERIS***

Anthony Casanova, ("Petitioner"), confined at the Gus Harrison Correctional

Facility in Adrian, Michigan, filed a petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254 through attorney Michael Ryan Waldo of the State Appellate

Defender's Office.  Petitioner challenges his conviction for first-degree felony

murder, M.C.L.A. 750.316(1)(b).  For the reasons that follow, the petition for writ

of habeas corpus is **DENIED WITH PREJUDICE.**

## I. BACKGROUND

Petitioner was convicted following a jury trial in the Muskegon County

Circuit Court.  This Court recites verbatim the relevant facts regarding petitioner's

conviction from the Michigan Court of Appeals' opinion affirming his conviction,

1

since they are presumed correct on habeas review. *See Wagner v. Smith*, 581 F. 3d

410, 413 (6th Cir. 2009):

> Defendant's conviction arises out of the sudden death of his infant son, TC, on January 4, 2013. The evidence established that TC was born perfectly healthy on October 26, 2012. On the day in question, TC's mother left TC in defendant's care while she went to work. Hours later, emergency personnel were called to defendant's house for an "unresponsive child." First responders arrived to find TC unconscious, not breathing, and without a pulse. He had multiple bruises, which appeared to be in varying degrees of healing, on his chest and abdomen. The responders were unable to revive TC.
>
> An autopsy ultimately revealed that TC died of "multiple injuries." The following injuries were noted by the medical examiner (ME): approximately 25 bruises on TC's chest and abdomen, circular in design, that were of "multiple varying colors;" a large hematoma on the right side of TC's head; a lacerated liver; a lacerated spleen; a total of 15 rib fractures, some of which had "callous formations" suggesting that they were older and healing; a contusion on the heart; a skull fracture several inches in length; and "a large amount of blood that had accumulated beneath the skull, not just associated with the fracture but from tearing of veins that connect the lining underneath the bone to the brain itself." The ME concluded that TC's injuries were the result of significantly forceful and violent actions. She opined unequivocally that TC's injuries were not accidental but rather intentionally inflicted.
>
> Defendant initially told various first responders, medical personnel, and a detective that TC sustained his injuries after defendant tripped over the family dog while carrying TC, causing defendant to drop the baby before ultimately falling on top of him. [1] However, during a subsequent police interview and prior to being given his *Miranda* rights, defendant admitted "bouncing" TC off an air mattress seven or eight times in what was "a little more than a play bounce." Later, and still prior to being Mirandized, defendant added that he might have squeezed TC "a little too hard" to stop his crying, with defendant also stating that he had

---

[1] We note that TC's mother testified that just one day before the child died, defendant gave the exact same explanation to her with respect to the cause of a bruise on TC. (Footnote original).

2

bounced TC off the bed because of the crying.  Defendant was then read his *Miranda* rights.  Afterward, defendant informed police that, in response to TC's crying, he had squeezed TC twice in kind of a "bear hug," causing TC to lose his breath for a few seconds, and that when TC started crying again, defendant bounced him off the bed.

The trial court suppressed the un-Mirandized statements made by defendant, but allowed the admission of the statements made by defendant after he was given his *Miranda* rights.

*People v. Casanova*, No. 324819, 2018 WL 1072680, at * 1–2 (Mich. Ct. App. Feb. 27, 2018)(additional footnotes omitted).

The conviction was affirmed. *Id., lv. den* 503 Mich. 861, 917 N.W.2d 390

(2018); *cert. den. sub nom Casanova v. Michigan,* 139 S. Ct. 1192 (2019).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. Mr. Casanova was denied this Sixth Amendment right to the effective assistance of counsel where his trial attorney failed to present, or failed to discover through a reasonable investigation, evidence that would have directly contradicted the prosecution's assertion that he intentionally injured his son.

II. Mr. Casanova was deprived of his Fifth Amendment right against self-incrimination where the trial court admitted Mr. Casanova's post-Miranda incriminating statements following more than two hours of interrogation without being advised of his Miranda rights.

## II. STANDARD OF REVIEW

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), imposes the following standard of review for

habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA

thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010)((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)(*per curiam*)).   "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   To obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.   A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

## III. DISCUSSION

### A. Claim # 1.  The ineffective assistance of counsel claim.

Petitioner first argues that his counsel was ineffective for failing to obtain and call an expert at trial to counter the conclusions and opinions of the medical examiner

as to the cause of TC's death and the medical examiner's opinion that the death was intentional not accidental.

A defendant must satisfy two things to establish the denial of the effective assistance of counsel. First, the defendant must demonstrate that his or her attorney's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*. Stated differently, the defendant must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id*. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

On habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether

6

that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. at 101.  "Because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664).  Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.*  This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101.

Because of this doubly deferential standard, the Supreme Court has indicated that:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, 562 U.S. at 105.

7

In addition, a reviewing court must not merely give defense counsel the benefit of the doubt but must also affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did. *Cullen v. Pinholster,* 563 U.S. 170, 196 (2011).

Petitioner argues that this Court should not employ AEDPA's deferential standard because the Michigan Court of Appeals did not reach the prejudice prong of the *Strickland* standard in rejecting his ineffective assistance of counsel claim.

The Sixth Circuit has found that when a state court only addresses one prong of the *Strickland* test in rejecting a habeas petitioner's ineffective assistance of counsel claim, the federal habeas court should review that prong under the AEDPA's deferential standard of review but apply *de novo* review to the other prong. *See, e.g., Rayner v. Mills,* 685 F. 3d 631, 636-39 (6th Cir. 2012). This, however, is a "peculiar rule" that is contrary to both the letter and the spirit of § 2254(d), and consequently one that the Sixth Circuit subsequently questioned. *See Hodges v. Colson,* 727 F. 3d 517, 537, n. 5 (6th Cir. 2013). The Sixth Circuit in *Hodges* believed that the panel in *Rayner* had ignored the Supreme Court's language in *Harrington* which indicated:

> Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) *applies when a "claim," not a component of one, has been adjudicated.*

> *Id.* (quoting *Harrington,* 562 at 98)(emphasis original).

8

The Sixth Circuit also noted in *Hodges* that their prior holding in *Rayner* created a "peculiar rule" by which "the more information the state court provides, the less deference we grant it.  This is contrary not only to the language of the statute, which speaks of "claims," not components of claims, but also contrary to the spirit of § 2254(d), which is designed to give more deference to a state court judgment on the merits." *Id.*

Pursuant to *Harrington,* AEDPA's deferential standard of review applies, even if the Michigan Court of Appeals did not explicitly address the prejudice prong of the ineffective assistance of counsel claim.  As discussed below, the Michigan Court of Appeals found that trial counsel was not deficient.  Such a finding "implicitly, but unequivocally, encompasses a finding that the performance did not prejudice the defendant." *Hodges,* 727 F.3d at 537, n. 5.

A *Ginther* hearing [2] was held in the state trial court over the course of three days to address petitioner's ineffective assistance of counsel claims.  In addition to calling petitioner's trial counsel, Muskegon County Public Defender Fred Johnson, petitioner's appellate counsel called three expert witness in an attempt to show that had these witnesses been contacted by counsel during pre-trial investigation and called during trial, there is a reasonable probability that the outcome of the trial

---

[2] *People v. Ginther,* 390 Mich. 436, 212 N. W. 2d 922 (1973).

would have been different. These witnesses were (1) the Oakland County Medical Examiner (Dr. Ljubisa Dragovic), (2) a forensic biomechanical engineer (Dr. Steven Rundell), and (3) another biomechanical engineer (Dr. Christopher Van Ee). The prosecution similarly presented rebuttal expert testimony from a biomechanical engineer (Dr. James Ashton-Miller).

At the conclusion of the hearing, the trial judge rejected petitioner's ineffective assistance of counsel claim in a lengthy written opinion. *See People v. Casanova,* No. 13-063270-FC (Muskegon Cty. Cir. Ct., Sep. 25, 2017)(ECF No. 8-24, PageID. 2088-2094). The judge initially summarized what he believed to be the pertinent parts of the testimony from the hearing:

> In support of his position, the Defendant presented testimony of three expert witnesses at an evidentiary hearing on the motion  The medical examiner from Oakland County questioned the methods and conclusions of the medical examiner who testified at the trial and said that he could not exclude the possibility that the victim could have been killed accidentally in the manner the Defendant had stated by tripping and falling on him. Evidentiary hearing, June 21, 2016 transcript p 33. He also testified the infant could have sustained his injuries from being slammed on an air mattress as contended by the Prosecution. *Id* pp 37-8. When asked if someone squeezed the child to the point that he stopped breathing, would it be child abuse, the witness responded that was the cause of death in this case. *Id* p 90. In addition, a biomechanical engineer provided an opinion that the Defendant could not have caused the skull fracture of the victim by thrusting him on an air mattress several times. Evidentiary hearing, July 25, 2017, transcript p 35. The Prosecution presented a biomechanical engineer who provided an opinion that the Defendant could, indeed, have caused a skull fracture by bouncing the child on the air mattress. Evidentiary hearing, February 27, 2017, p 37.

The Defendant's trial attorney testified at the evidentiary hearing on the motion.  His trial strategy was to convince the jury that the child was injured when the Defendant was carrying him and fell on him after tripping over a dog. Evidentiary hearing, June 21, 2016, transcript p 8. This was one of the versions provided by the Defendant to the police during the investigation of the case.  The Defendant initially told the police that he had tripped and fallen on the child the day before and the day of his death.  Subsequently, he changed his story and admitted that he had not tripped and fallen on the baby on the day of his death but, instead, had thrust him on an air mattress numerous times and squeezed him to the point he had stopped breathing.  To support the trip and fall version, defense counsel investigated the possibility of calling an expert witness.  He consulted a list of experts generated by the State Appellate Defenders Office. *Id* p 11.  After contacting three different potential experts, he settled on a specific one because he felt this person could most effectively communicate. *Id* pp 11-12.  Trial counsel followed up these efforts with a petition to the Court for expert witness funding. *Id* p 9.  However, the expert witness did not find fault with the methods and conclusions of the medical examiner.  He also advised defense counsel that his testimony would not be necessary because the medical examiner would have to admit under cross-examination the possibility that the victim sustained his injuries from the trip and fall scenario. *Id* p 24.  With this opinion in mind, the defense attorney made a ·conscious decision not to call the witness to testify. *Id*. [3]  This advice turned out to be inaccurate.

(ECF No. 8-24, PageID. 2089-91).

The trial judge then rejected petitioner's allegation that trial counsel had been

deficient for failing to continue to look for additional experts:

It is not ineffective assistance for an attorney to fail to continue searching for an expert until he finds one with opinions favorable to his theory. *People v Eliason*, 300 Mich App 293; 833 NW2d 357 (2013).

---

[3] This advice turned out to be inaccurate. At trial the medical examiner refused to admit that the evidence supported the trip and fall story. However, the Court must not assess the reasonableness of the attorney's decisions from the perspective of hindsight. *See, Strickland, supra*, at 690. (Footnote original).

11

In this case, after obtaining funding from the court and considering several experts, the defense attorney obtained an opinion that did not materially challenge the one offered by the prosecution's witness. Defendant now suggests that the witness consulted by the prosecution didn't have as impressive credentials as those of the Oakland County Medical Examiner who testified at the evidentiary hearing. However, the Court must consider the trial attorney's performance in the context of the case at the time he made his decisions. *Strickland, supra*, at 690. At the time the defense attorney chose a person who was board certified in forensic medicine, a diplomat of the American Board of Forensic Examiners, member of the Michigan Association of Medical Examiners and Deputy Medical Examiner for Bay County. Defendant's Supplemental Brief, Exhibit A.  In his capacity as the deputy medical examiner he assists a pathologist in the performance of autopsies and collects data from crime' scenes. *Id*.  This is a vastly different scenario than was presented to the defense attorney in *Ackley*.  In that case, not only was the expert consulted not qualified, he actually told the attorney that he was not the person for that case and went so far as to direct the lawyer to a specific expert who could be helpful.  In this case, the curriculum vitae and prior testimony of the expert chosen by the defense indicated that he was qualified.  Moreover, he offered an opinion without reservation about the case and made no suggestion that he was either not qualified to do so or that the other experts should be consulted as was done in *Ackley*.

This must all be considered in the context of a case where the Defendant first offered a version that he accidentally fell on the child but later admitted that he had thrust the child down onto an air mattress multiple times and squeezed him to the point that he stopped; breathing.  This is materially different from the *Ackley* defendant who consistently maintained a posture of innocence.  In addition, unlike the facts in *Ackley*, there was testimony that corroborated the theory of the prosecution that this child died from injuries inflicted at the hands of the Defendant on the day of his death.  The medical examiner testified that if the fall the previous day had caused the injuries she observed, this child would not have been acting normally in the hours between the fall and his death.  However, the child's mother had ample opportunity to observe her son during that time and did not notice anything that would explain the extensive injuries confirmed by the medical examiner.  In contrast, on the night of her son's death, medical

12

personnel noticed the child's swollen head. In addition, both the Oakland County Medical Examiner and the medical examiner who performed the autopsy and testified at trial observed fresh blood on the dura in a microscopic slide which is indicative of recent trauma. Evidentiary hearing June 21, 2016, pp. 108-9.

Trial counsel's investigation of expert witnesses and conclusion, as a matter of trial strategy, not to present expert testimony that would agree with the prosecution's expert while also supporting the Defendant's theory as a possibility, did not fall below an objective standard of reasonableness in the context of the existing norms for criminal defense attorneys. [4] Defendant has not overcome the strong presumption that this was a matter of sound trial strategy. Having determined that one of the two requirements for establishing ineffective assistance of counsel has not been satisfied, it is not necessary to address the issue of prejudice to the defense, however, the Court will provide an opinion since both parties extensively briefed this issue.

(ECF No. 8-24, PageID. 2091-93).

After discussing the prejudice requirement for an ineffective assistance of counsel claim, the judge concluded that petitioner was not prejudiced by the trial counsel's failure to call an expert on the issue of the cause of death:

In this case there were two ways the Defendant could have killed the infant child. One method was bouncing him off the air mattress multiple times; the other was by squeezing him. The Defendant admitted doing both of these. He also provided a third alternative which was by accidentally tripping and falling on the victim the day before his death. The jury elected to believe his admissions regarding intentional behavior. The fact that there is a biomechanical engineer who would say that the bouncing theory ·is not feasible while another biomechanical engineer would say that it is, does not demonstrate a reasonable probability of a different outcome. The fact that the

---

[4] Had the Oakland County Medical Examiner testified, in addition to endorsing the possibility of the trip and fall story, he also would have admitted that forcibly squeezing the child to the point he stopped breathing was the cause of death. Evidentiary hearing, June 21, 2017, transcript p 90. The Defendant admitted squeezing the Infant to the point the he stopped breathing on the night he passed away. (Footnote original).

Oakland County Medical Examiner would cast doubt on the bouncing theory but support the squeezing and accidental theories does not present a probability of a different outcome.  Of course, a different outcome is *possible* but the Defendant has not shown that it is *probable*.  This Court will not impose a lesser burden than that which was required by *Strickland. See, Pickens, supra.*

(ECF No. 8-24, PageID. 2093-94)(emphasis original).


The Michigan Court of Appeals subsequently rejected petitioner's claim:

At the *Ginther* hearing, defendant produced the testimony of experts, who did not give an opinion as to the cause of TC's death, but did call into question aspects of the ME's conclusions, methods, findings, processes, and timing of injuries, indicating that an accident could not be ruled out as the cause of death.

This is not a case wherein defense counsel did not contemplate and look into obtaining an expert; he did so.  Indeed, the trial court's decision to deny defendant's motion for new trial based on ineffective assistance of counsel was primarily predicated on the fact that defense counsel consulted with an expert but chose not to call him as a witness.  We agree with the trial court's determination that an attorney is not ineffective for failing "to continue searching for an expert until he finds one with opinions favorable to his theory." We adopt the trial court's written opinion and order denying defendant's motion for new trial as our own relative to that portion of the opinion regarding whether defense counsel's performance was deficient.

*People v. Casanova*, No. 324819, 2018 WL 1072680, at * 4 (internal footnote omitted).

The Michigan Court of Appeals declined to address the prejudice issue. *Id.,* n. 5.

Petitioner failed to show that the state courts' determination that counsel was not deficient in failing to seek additional experts as to the cause of death was unreasonable.

At the *Ginther* hearing, petitioner's trial attorney explained how he developed the defense strategy. Fred Johnson, petitioner's trial counsel, reviewed all police reports, the autopsy reports, and met with petitioner. Muskegon County Medical Examiner Dr. Joyce DeJong determined that TC died of multiple injuries that were intentionally inflicted. After reviewing the relevant materials, Johnson's decided strategy was not to attack the medical examiner's conclusions as to how TC died. Instead, counsel decided to present a defense that the injuries TC suffered were not intentional. Johnson sought to emphasize for the jury that Dr. DeJong was unable to prove what was in petitioner's "head and heart." Counsel's strategy was to argue that TC's death, and the injuries he suffered, were purely the result of a tragic accident. To rebut any accusation of intent, counsel argued to the jury that petitioner's original story, that he tripped over the dog, dropped TC, and fell on top of him, was the truth. (6/21/16, Ginther Hr'g Tr., P.M. Session, at 8)(ECF No. 8-18, PageID. 1337). Combining the trip and fall story with vigorous CPR, counsel sought to remove the intent element left open by the air-mattress narrative. (*Id*. at pp. 29–30)(*Id.,* PageID. 1358-59).

15

After arriving at this strategy, counsel sought funding for an expert to help him understand the "mechanics" behind TC's death in order to put forth the opinion that TC could have died as the result of an accidental fall. (*Id.* at pp. 9–11)(ECF No. 8-18, PageID. 1338-40).  Counsel contacted three potential experts narrowed down from a database of expert witnesses maintained by the State Appellate Defender's Office (SADO)(Petitioner's current counsel).  One of the experts counsel chose to contact was Dr. William Morrone, an assistant medical examiner.  Counsel believed that Dr. Morrone was previously an assistant medical examiner of either Macomb County Ottawa County. [5] (*Id.*, at pp. 11-12)(*Id.,* PageID. 1340-41).  Counsel, through his research into Dr. Morrone's background that was provided in the SADO database, learned the doctor had "a lot of experience in terms of autopsies[,]" "a marvelous curriculum vitae[,]" and based on transcripts listed under his name, Dr. Morrone communicated to juries in a way they could understand. (*Id.* at pp. 12-13)(*Id.*, PageID. 1341-42).  Counsel contacted Dr. Morrone and later spoke with him about the facts of petitioner's case.  Counsel sent Dr. Morrone the photographs, autopsy report, police reports, fire department report, and paramedic report.  Counsel specifically shared with Dr. Morrone information about the dog trip and fall theory, as well as the other theory regarding the air mattress. (*Id.,* at pp. 14, 17)(*Id.*, PageID. 1343, 1346).

---

[5]  Dr. Marrone, in fact, was the Deputy Medical Examiner for Bay County.

16

After Dr. Morrone reviewed the materials, the doctor informed counsel that the autopsy report was "essentially accurate," but he thought there was room to expand on these other theories[.]" Dr. Marrone indicated that although Dr. DeJong's conclusions were not wrong, "that other possibilities existed." Counsel was under the impression from Dr. Morrone that an "honest [medical examiner]" would have to admit that other possibilities besides hitting the air mattress, existed to explain TC's injuries. Counsel also indicated at the *Ginther* hearing that Dr. Morrone could not rebut Dr. DeJong, but he did provide ideas for cross-examination. The reason being that Dr. Morrone saw support for the defense's embraced theory of a trip and fall. After speaking with Dr. Morrone, counsel decided that an expert was not necessary because (1) he believed Dr. DeJong would have to admit that there could be alternative explanations for TC's injuries and (2) Dr. Morrone would not have provided "significant distance from the [Dr. DeJong][.]" (*Id.,* at pp. 18-19)(ECF No. 8-18, PageID. 1347-48). Although Dr. Morrone told counsel that he saw support for the trip and fall theory, both men felt that admission could, and should, come from Dr. DeJong as well. (*Id.,* at pp. 23–24)(*Id.,* PageID. 1352-53). At trial, Dr. DeJong refused to concede that an accidental drop and fall could have explained all of TC's injuries. (Tr. 10/25/14, [6] pp. 57–65)(ECF No. 8-15, PageID. 1097-1105). However, defense counsel through cross-examination was able to get

---

[6] The trial transcript was mislabeled 10/25/14, when the actual date of the trial was September 25, 2014.

17

Dr. DeJong to admit that the injuries TC suffered would have been extremely rare through a drop and fall scenario, but that it was not impossible. (*Id.,* at pp. 65-66)(*Id.,* PageID. 1105-06).

The question for this Court on habeas review is whether any fairminded jurist could agree with the trial court and the Michigan Court of Appeals that counsel's failure to seek additional experts to testify that TC's injuries could have resulted from him being accidentally dropped satisfied the reasonableness standard enunciated in *Strickland. Davis v. Carpenter,* 798 F.3d 468, 473 (6th Cir. 2015). "That standard is a general one, governing a great blue-water of attorney conduct: from pre-trial discovery to plea-bargaining, from in-court trial tactics to post-verdict motions, from direct appeals to post-conviction challenges. The Supreme Court has charted only parts of that expanse." *Id.* The Sixth Circuit in *Davis* concluded that when faced with the question of whether trial counsel was ineffective for failing to seek additional experts to support the defense theory that the victim in that case had died after being accidentally dropped, the Tennessee Court of Appeals found itself in "open water.":

> The Supreme Court has never reached the specific questions that the Tennessee courts answered in this case: how many experts must an attorney contact before proceeding without one, what kinds of outside advice can the attorney rely upon, and ultimately how hard must he try. The only buoy in sight, far off on the horizon, was the Court's guidance in *Strickland* itself that counsel's efforts must be within "the wide range of reasonable professional assistance [.]" 466 U.S. at 689, 104 S.Ct. 2052. That rule is as general as they come. And "[t]he more general the rule, the more leeway courts have in

18

reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

*Id.,* at 473–74.

The Sixth Circuit concluded that the Tennessee Court of Appeals' did not unreasonably apply *Strickland* by concluding that trial counsel's efforts to find a medical expert to testify at a second murder trial that the infant's fatal injuries could have been sustained when the habeas petitioner accidentally dropped his child were professionally reasonable. *Id.* at 474.   Counsel tried to convince an expert from the first trial to testify at the second trial, and worked side-by-side with the first expert's attorney to find another expert when the first expert refused to testify at second trial. Counsel also called one or two doctors himself. *Id.*   Although the Sixth Circuit acknowledged that trial counsel could have done more than he did to find another expert, fairminded jurists could conclude that counsel's efforts to find an expert "fell in the permissible zone between "best practices" and outright incompetence." *Id.*

"Effective assistance does not require counsel to continue contacting experts until he found one...willing to testify against the prosecution's theory of the case." *Flick v. Warren*, 465 F. App'x. 461 465 (6th Cir. 2012)(petitioner's counsel in a second-degree murder prosecution was not ineffective for failing to call an expert to challenge the science underlying Shaken Baby Syndrome, after counsel had

19

contacted three doctors seeking help with the case and had received unfavorable responses from all three).

Secondly, although trial counsel did not present an expert to challenge Dr. DeJong's opinion that the death was intentional, trial counsel extensively cross-examined her findings and did get Dr. DeJong to admit that it was not impossible that TC could have died from an accidental fall. The Supreme Court has noted that: "[I]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Harrington v. Richter,* 562 U.S. at 111. Defense counsel's decision to cross-examine Dr. DeJong to challenge her findings, instead of calling an expert witness for the defense to challenge her claim that the death was intentional, was a reasonable trial strategy that defeats petitioner's ineffective assistance of trial counsel claim. *See Tinsley v. Million,* 399 F.3d 796, 806 (6th Cir. 2005); *See also Jackson v. McQuiggin,* 553 F. App'x. 575, 580-82 (6th Cir. 2014); *Stevens v. U.S.,* 298 F. Supp. 2d 657, 660-61 (E.D. Mich. 2004).

Petitioner is also not entitled to relief because he failed to show that any of the proposed expert witnesses would have exculpated him of the murder charge. All of petitioner's proposed witnesses admitted that they had no opinion as to the cause of death here. Petitioner is not entitled to habeas relief because he has failed to show that he has an expert who could have testified conclusively that the TC died after being accidentally dropped by petitioner. *See Tinsley v. Million,* 399 F.3d at 806.

There were several problems, for example, with Dr. Dragovic's testimony at the *Ginther* hearing.  Dr. Dragovic noted that while he would have preferred Dr. DeJong to have done more slides, or taken more sampling to determine that the head injuries were "acute," he admitted that the presence of fresh blood in the dura from the slide Dr. DeJong did take during the autopsy was indicative of "recent trauma" and was caused by impact with a hard, "unyielding surface like a floor or something like that[.]" (6/21/16, Ginther Hr'g Tr., A.M. Session, pp. 37, 109)(ECF 8-17, PageID. 1255, 1327).  Dr. Dragovic indicated that he found evidence of old rib fractures as well as newer rib fractures.  He also doubted appellate counsel's suggestion that these older rib fractures could have happened while the baby was still in utero., (*Id.,* at pp. 38-39)(ECF No. 8-17, PageID. 1256-57).  Dr. Dragovic's credentials as an expert in pediatric trauma were called into question by his admission that he has never peer reviewed articles on child abuse nor written any articles on pediatric trauma.  Dr. Dragovic conceded that he has only been involved with one pediatric homicide case as a medical examiner. (*Id.,* at p. 42)(*Id.,* PageID. 1260).  Dr. Dragovic admitted that he did not review the police interrogation of petitioner or the ambulance report nor could he recall reviewing the trial testimony of the victim's pediatrician or review the victim's health records.  Dr. Dragovic may have reviewed the Emergency Room Doctor's report, but acknowledged that he did not consider it in his assessment of the case. (*Id.,* at pp. 44-46)(*Id.,* PageID. 1262-

64). Dr. Dragovic admitted that TC's pediatric records from his baby wellness visits, including one conducted only five days before TC died, showed no injuries or bruises. (*Id.,* at pp. 72-75)(*Id.,* PageID. 1290-93). Dr. Dragovic also conceded that TC's mother had testified at trial that petitioner had told her the day before TC died that he had fallen on TC after tripping over the dog but that TC was fine the next day. (*Id.,* at pp. 76-77)(*Id.,* PageID. 1294-95). Dr. Dragovic indicated he was not surprised that the first responders and the emergency room doctor observed swelling on the right side of TC's head. (*Id.,* at pp. 84-85)(*Id.,* PageID. 1302-03). Dr. Dragovic admitted he did not examine TC's brain or eyes. (*Id.,* at p. 88)(*Id.,* PageID. 1306). Dr. Dragovic admitted that cardiopulmonary resuscitation (CPR) was not the cause of the victim's retinal hemorrhaging in this case. Dr. Dragovic acknowledged that it would be child abuse to squeeze a child to the point of them losing their breath not only once but twice. (*Id.,* at pp. 90-91)(*Id.,* PageID. 1308-09). Dr. Dragovic admitted that he did not have an opinion as to the cause and manner of death. (*Id.,* at pp. 95-96)(*Id.,* PageID. 1313-14).

Likewise, Dr. Steven Rundell, a biomechanical engineer, offered testimony at the *Ginther* hearing that would not have done much, if anything, to rebut Dr. DeJong's conclusion that TC's manner of death was homicide and that the injuries were intentionally inflicted. Dr. Rundell stated that he was not offering any opinion on how the injuries happened. Instead, Dr. Rundell merely offered an opinion on

22

whether either of the possibilities are "biomechanically consistent with the documented injury." (7/25/16, Ginther Hr'g Tr., p. 46)(ECF No. 8-19, PageID. 1412). Dr. Rundell formed his opinion without examining or testing the actual air mattress in question in this case. Dr. Rundell pointedly did not test an air mattress at all. (*Id.*, pp. at 55–56, 61)(*Id.,* PageID. at 1421-22, 1427).

In addition, had Dr. Rundell been called to testify, his proposed testimony would have been called into question by the prosecutor calling an expert of his own in that field. Dr. James Anthony Ashton-Miller is a biomechanical engineer who works specifically in the fields of biomedical engineering and internal medicine. At the *Ginther* hearing, Dr. Ashton-Miller opined that, takin into account petitioner's weight and the nature of the specific air mattress upon which TC was thrown, as much as eight times, such action could have caused the fracture in TC's skull. (2/27/17, Ginther Hr'g Tr. at pp. 16, 37–38)(ECF No. 8-20, PageID. 1481, 1502-03). Dr. Ashton-Miller indicated that repeated impacts would increase the change of skull fracture since the first impact can cause micro failures of the bone and then the second impact causes more micro failures of the bone and eventually the micro failures form a catastrophic failure. Stated differently, "with each repeated blow the probability of [] fracture goes up." (*Id.*, at pp. 34–35)(*Id.,* PageID. 1499-1500). It was Dr. Ashton-Miller's opinion that the probability of skull fracture on the exact

mattress TC was thrown upon was 75% in a single impact and higher after repeated impacts. (*Id.,* at pp. 37–38)(*Id.,* PageID. 1502-03).

Neither Dr. Dragovic nor Dr. Rundell offered an opinion as to the cause of death. Significantly, neither man was willing to testify that the victim's death was accidental. Both men's testimony could have easily been impeached on a number of subjects. Significantly, Dr. Dragovic, had he been called to testify, would have actually confirmed many of Dr. DeJong's findings. Petitioner is not entitled to habeas relief, because none of his proposed expert witnesses could have offered exculpatory testimony.

Finally, counsel's failure to present expert witnesses to bolster petitioner's accident defense was not prejudicial to petitioner in light of the overwhelming evidence that the victim died from child abuse and not from an accident.

TC's pediatrician testified that she examined the victim at his three wellness visits, including one performed only five days before he died. Other than mild jaundice in his eyes at his two week visit and a cold at his eight week visit, TC appeared healthy to the pediatrician. The pediatrician did not notice any bruises or injuries. She did not observe any abnormalities to the victim's retinas. (Tr. 9/24/14, pp. 76-84)(ECF No. 8-14, PageID. 1012-20).

TC's mother Julie Striker testified on January 3, 2013, the day before TC died, petitioner told her that he accidentally tripped over the dog and fell down with TC.

24

Petitioner informed the mother there was a mark on TC's chin, but any concern Striker had diminished because TC was eating well, sleeping well, and behaving normally that evening. TC showed no signs of distress, such as vomiting or urinating blood. (*Id.,* at pp. 23-24)(*Id.*, PageID. 959-60).

Norton Shores Deputy Fire Chief Joseph Kinnucan was the first emergency personnel to arrive at petitioner's home. Upon arrival, petitioner informed the chief that when he was letting the dog inside, it ran underneath him, causing him to "land very hard" on top of TC. (Tr. 9/23/14, pp. 140–43)(ECF No. 8-13, PageID. 862-65). When Dep. Chief Kinnucan began treating TC, he noticed bruises on the victim's body, on the jaw area, clavicle area and the torso area. In Kinnucan's opinion, the bruises were in "varying degrees of healing" and could not have been the result of CPR being performed in the minutes before he arrived at the scene. (*Id.*, at pp. 144–45, 154-55)(*Id.,* PageID. 866-67, 876-77). While in the ambulance and applying the bag valve mask to assist in TC's breathing, Kinnacun noticed bruising and swelling to the back of TC's head and noted it to the paramedics. (*Id.*, at pp. 147–48)(*Id.,* PageID. 869-70).

Norton Shores Police Officer Matthew Rhyndress was the second responder on the scene, but the first police officer. (Tr. 9/23/14, p. 175)(ECF No. 8-13, PageID. 897). Officer Rhyndress spoke briefly to petitioner at the scene and his body microphone recorded the conversation via his police cruiser. Petitioner again

indicated that he tripped over the dog.  Officer Rhyndress asked Casanova if TC had been injured prior to that day at all, but contrary to the version he told his girlfriend, petitioner said "no." (*Id.*, at pp. 177-83)(*Id.,* PageID. 899-905).

Paramedic Jonathon Degen assessed TC and found him "unresponsive, not breathing, no pulse[]" with "some bruising on his right chin area, his right shoulder area and then the left clavicle."  While still inside petitioner's home, Degen noticed a large hematoma on the right side TC's head.  When Degan palpated it, he could "feel the bone fragments moving around" and presumed there was a skull fracture. (Tr. 9/23/14, pp. 193–96)(ECF No. Page ID. 915-18).

Dr. Jerry Evans was an emergency room physician at Hackley Hospital in Muskegon.  TC was in cardiac arrest and was not breathing, so a team was assembled in a trauma room to receive him.  Dr. Evans was told by the paramedics that the father had "dropped the patient and fallen on him."  Dr. Evans continued CPR, intubated TC to assist his breathing, and gave him mediations to attempt to revive him.  Dr. Evans observed a large hematoma on TC's right parietal scalp and multiple bruises on TC's chest that appeared slightly aged. (Tr. 9/24/14, pp. 4–7)(ECF No. 8-14, PageID. 940-43).  When Dr. Evans assessed TC's condition, the hematoma was so large he could not adequately palpate the skull in order to determine if there were any deformities. (*Id.*, at p. 9)(*Id.,* PageID. 945).  Dr. Evans concluded that TC suffered cardiac arrest as a result of trauma, whether from injuries to his head or

injuries to his chest. Dr. Evans was unable to oxygenate TC, meaning, that when administered oxygen, TC's chest was not rising as it should have. Dr. Evans indicated that this meant there was likely "a significant amount of injury to the chest wall[.]" Dr. Evans emphasized that cardiac arrest in happens in infants only if there has been a "catastrophic injury." (*Id.,* at pp. 10-11)(*Id.,* PageID. 946-47). Dr. Evans testified this was an obvious case of blunt trauma, so hospital personnel treated it as such even though that's not the story they were told. Petitioner told Dr. Evans that he had tripped over the dog and fallen with TC. (*Id.,* at pp. 12-13)(*Id.,* PageID. 948-49). Dr. Evans spoke to police after being unable to save TC's life because the trip and fall story was inconsistent with the injuries he observed. Dr. Evans opined that the story of a recent fall was not consistent with the slightly older looking bruises on TC's chest and abdomen that were "in the pattern of a finger[.]" To Dr. Evans, the bruising to TC's chest was "clear[ly]" not "from a fall just a few minutes before the patient came in." (*Id.*, at p. 10)(*Id.,* PageID. 946).

In light of the overwhelming evidence that the victim had died from child abuse, there was no reasonable probability that the result of the trial would have been different had petitioner's proposed expert witnesses been called to testify, thus, trial counsel was not ineffective for failing to present an expert to challenge Dr. DeJong's conclusions that the death was the result of an intentional act and would not entitle petitioner to habeas relief. *See Lutze v. Sherry*, 392 F. App'x. 455, 459-60 (6th Cir.

2010)(murder defendant was not denied effective assistance by appellate counsel's failure to raise trial counsel's failure to challenge shaken baby syndrome (SBS) evidence; there was no reasonable probability that the result of the trial would have been different had the SBS evidence been challenged).

Petitioner is not entitled to habeas relief on his first claim.

**B. Claim # 2.  The *Miranda* claim.**

Petitioner next argues that both his pre and post-*Miranda* statements given while speaking with the police should have been suppressed under *Missouri v. Seibert*, 542 U.S. 600 (2004) and because Detective Nanna advised him of his *Miranda* rights "midstream," and only after obtaining an incriminating statement.

The Michigan Court of Appeals rejected the claim, finding that any possible error in admitting petitioner's statements was harmless error at most:

> Here, any error in failing to suppress the post-*Miranda* statements was harmless beyond a reasonable doubt because reasonable jurors would still have found defendant guilty on the basis of the untainted evidence, which overwhelmingly established defendant's guilt.   First, as mentioned above, the evidence revealed that this was not the first time defendant claimed to have injured TC by tripping over the family dog, as TC's mother testified that just one day before the fatal incident, defendant used the very same scenario to explain a bruise on TC's chin. By the mother's own admission, it was odd that defendant employed the same excuse to also explain TC's fatal injuries a day later.   This evidence substantially, if not completely, undermined any claim of accident.   Moreover, the ME testified and stated unequivocally that TC's injuries were caused intentionally, not accidentally.   Her opinion rested on several factors.   First, the multiple bruises on TC's chest area did not fit "whatsoever" defendant's claimed act of tripping and falling; the bruises looked like finger marks.   Given TC's age and the fact that

he was not yet mobile, there was no logical reason for such bruises to exist on his body, leading the ME to opine that they were "non-accidental in nature."  Second, TC's rib fractures, some of which were healing and all of which were caused by "significant" force, did not fit the pattern of a one-time, crushing-type injury but were instead indicative of intentional abuse.  Finally, in the ME's opinion, defendant's version of events would not have accounted for the tearing of the veins under TC's skull, which required "motion and impact," not just blunt force trauma to the head.  These observations led the ME to conclude that there was "really nothing else to explain" the child's fatal injuries, other than that they were intentionally inflicted.  The ME expressed that she was "very confident" in her conclusion that the manner of TC's death was homicide.

In light of the above untainted evidence, it is clear to us, beyond a reasonable doubt, that a rational jury would have found defendant guilty even absent the admission of the challenged portion of his confession.

*People v. Casanova*, 2018 WL 1072680, at * 3.

"Unless its jurisdiction is at stake, a federal district court on federal habeas review 'may take up issues in whatever sequence seems best, given the nature of the parties' arguments and the interest in avoiding unnecessary constitutional decisions.'" *Dittrich v. Woods*, 602 F. Supp. 2d 802, 809 (E.D. Mich. 2009); *aff'd in part and rev'd in part on other grds,* 419 F. App'x. 573 (6th Cir. 2011)(quoting *Aleman v. Sternes,* 320 F. 3d 687, 691 (7th Cir. 2003)).  When a federal court is confronted with several possible grounds for adjudicating a case, any of which would lead to the same disposition of the case, "a federal court should choose the narrowest ground in order to avoid unnecessary adjudication of constitutional issues." *Id.* (citing *U.S. v. Allen*, 406 F. 3d 940, 946 (8th Cir. 2005)).  Therefore, a

federal district court on habeas review of a state court conviction can proceed directly to a harmless error analysis of a habeas petitioner's claims without first reviewing the merits of the claim or claims, "when it is in the interest of judicial economy and brevity to do so." *Id.* (citing *Porter v. Horn*, 276 F. Supp. 2d 278, 344 (E.D. Pa. 2003).  Because of the compelling evidence of guilt in this case, the Court will move directly to the issue of harmlessness as to any potential error. See e.g. *United States v. Cody,* 498 F. 3d 582, 587 (6th Cir. 2007).

On direct review of a conviction, a constitutional error is considered harmless only if the reviewing court finds it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967).  In *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003)(per curiam), the Supreme Court held that habeas relief would be appropriate only if a habeas petitioner could show that a state court applied harmless error review in an "'objectively unreasonable' manner."

However, in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), the U.S. Supreme Court held that for purposes of determining whether federal habeas relief should be granted to a state prisoner on the ground of federal constitutional error, the appropriate harmless error standard to apply is whether the error had a substantial and injurious effect or influence in determining the jury's verdict.  "Citing concerns about finality, comity, and federalism," the Supreme Court in *Brecht* "rejected the *Chapman* standard in favor of the more forgiving standard of review applied to

nonconstitutional errors on direct appeal from federal convictions." *Fry v. Pliler*, 551 U.S. 112, 116 (2007)(citing *Kotteakos v. United States*, 328 U.S. 750 (1946)).

Petitioner seeks federal habeas corpus relief and must meet the *Brecht* standard, but that does not mean "that a state court's harmlessness determination has no significance under *Brecht*." *Davis v. Ayala*, 576 U.S. 257, 268 (2015). Where a state court uses the *Chapman* standard to determine that an error was harmless beyond a reasonable doubt, a federal court cannot grant habeas relief unless the state court applied the *Chapman* harmless error standard in an objectively unreasonable manner. *Id.* at 269-70.

"When a statement or confession of an accused party is admitted into evidence in violation of the Fifth Amendment, the admission constitutes a constitutional error that is subject to our harmless error analysis." *Cooper v. Chapman*, 970 F.3d 720, 729 (6th Cir. 2020). If a state court makes a harmless error determination on the admission of the statement, this determination is subject to AEDPA deference, *Id.*

The Michigan Court of Appeals determined that the admission of petitioner's statements, even if taken in violation of *Miranda*, was harmless error. This determination was reasonable, in light of the extensive evidence of petitioner's guilt even without the admission of his statements. In light of this extensive evidence of guilt, petitioner is unable to show that the admission of his statements had a substantial or injurious effect or influence on the jury verdict, in order to satisfy the

31

more demanding *Brecht* harmless error standard for habeas review.  The admission of evidence obtained from a suspect in violation of *Miranda* is considered harmful under *Brecht* only if it has a substantial and injurious effect in determining the jury's verdict. *See Kyger v. Carlton,* 146 F. 3d 374, 381-82 (6th Cir. 1998).  In light of the overwhelming evidence of guilt in this case, as recited extensively when addressing petitioner's ineffective assistance of counsel claim, *supra*, the admission of petitioner's statements, even if taken in violation of *Miranda,* did not have a substantial or injurious influence or effect on the jury's verdict. *Id.*  Accordingly, petitioner is not entitled to habeas relief on his second claim.

## IV. CONCLUSION

For the reasons discussed, state court adjudication of the petitioner's claims did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  Nor did the state court adjudication result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  This Court concludes that the petitioner is not entitled to federal habeas relief on the claims contained in his petition.

In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists

could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

This Court denies a certificate of appealability because reasonable jurists would not find this Court's assessment of the claims to be debatable or wrong. *See Slack v. McDaniel*, 529 U.S. at 484.

Although this Court will deny a certificate of appealability to petitioner, the standard for granting an application for leave to proceed *in forma pauperis* (IFP) is a lower standard than the standard for certificates of appealability. *See Foster v. Ludwick,* 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002)(citing *United States v. Youngblood*, 116 F. 3d 1113, 1115 (5th Cir. 1997)). Whereas a certificate of appealability may only be granted if petitioner makes a substantial showing of the denial of a constitutional right, a court may grant IFP status if it finds that an appeal is being taken in good faith. *Id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24

(a).  "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. *Foster,* 208 F. Supp. 2d at 765.   Although jurists of reason would not debate this Court's resolution of petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and petitioner may proceed *in forma pauperis* on appeal. *Id.*

## V.  ORDER

Based upon the foregoing, IT IS ORDERED that:

(1) the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

(2) A certificate of appealability is **DENIED.**

(3) Petitioner will be granted leave to appeal *in forma pauperis.*

s/Denise Page Hood
**HON. DENISE PAGE HOOD**
**Dated:  March 31, 2022**          UNITED STATES DISTRICT JUDGE